**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TEACHERS' RETIREMENT SYSTEM OF
LOUISIANA,
　　　　　　　*Plaintiff-Appellant,*

　　　　　　　and

BARRY SCHOENFELD, Individually and
on behalf of all others similarly
situated; SCHOENFELD GROUP;
BERNARDINELLI GROUP, Carmine
Bernardanelli, Joseph M. Hansen
and Frances C. Hunt being referred
to as Bernardinelli Group; GARY
SANDLER; ROCHELLE SANDLER; JUDY
A. SMITH; WILLIAM H. DAIL;
LOUISIANA SCHOOL EMPLOYEE
RETIREMENT SYSTEM,
　　　　　　　*Plaintiffs,*

　　　　　　　v.

FRED NEAL HUNTER; CYNTHIA B.
MERRELL; DOLPH W. VON ARX;
CHARLES SWOBODA; WALTER ROBB;
JOHN W. PALMOUR; CREE,
INCORPORATED; CALVIN H. CARTER,
JR.; JAMES E. DYKES,
　　　　　　　*Defendants-Appellees.*

No. 05-1988

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge;
Wallace W. Dixon, Magistrate Judge.
(CA-03-549-1)

Argued: September 20, 2006

Decided: February 20, 2007

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Wilkinson joined. Judge Shedd wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Richard Ara Harpootlian, Columbia, South Carolina, for Appellant. Bruce C. Vanyo, KATTEN, MUCHIN & ROSENMAN, L.L.P., Los Angeles, California, for Appellees. **ON BRIEF:** Jay W. Eisenhofer, John C. Kairis, Sidney S. Liebesman, GRANT & EISEN-HOFER, P.A., Wilmington, Delaware, for Appellant. Carl N. Patterson, Jr., Donald H. Tucker, Jr., SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina; Lyle Roberts, Paul Chalmers, Nicholas I. Porritt, Ilana Kramer, WILSON, SONSINI, GOODRICH & ROSATI, Reston, Virginia, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

The district court dismissed plaintiffs' 168-page securities-fraud class-action complaint brought against Cree, Inc., a high-technology business in Durham, North Carolina,[1] which purported to allege

---

[1]Founded in 1987, Cree is a major innovator and manufacturer of silicon carbide-based products, including semiconductors, transistors, and light-emitting diodes, which are used in a variety of products such as digital cameras and wireless telephones.

claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaint claims that Cree made misleading statements about its business transactions with six companies over a period of almost four years, which were discovered when a former officer sued the company in June 2003. Relying on Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, the district court held that the complaint failed to allege *facts* sufficient to support the plaintiffs' claims that Cree's statements were misleading. The court also concluded that the plaintiffs did not sufficiently allege that the statements were made with the requisite scienter or that plaintiffs' losses were caused by the misrepresentations and omissions of which they complained.

Applying the Private Securities Litigation Reform Act and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) to plaintiffs' complaint de novo, we affirm, concluding that plaintiffs are complaining only about market risks, not particularized securities fraud.

I

On June 12, 2003, Eric Hunter, co-founder and CEO of Cree, Inc., from 1987 to 1994, and his wife filed suit against Cree, F. Neal Hunter (Eric Hunter's brother and co-founder of Cree, as well as its CEO from 1994 to 2001 and chairman of the board thereafter), and other officers, alleging violations of state and federal securities laws, defamation, and intentional infliction of emotional distress. Eric Hunter also sought a preliminary injunction against Cree and Neal Hunter to prevent alleged personal harassment that appeared to have attended an ongoing family fight. News of the lawsuit caused the price of Cree's stock to fall the next day from $22.21 to $18.10.

Although Eric Hunter promptly settled his suit in August 2003, the allegations in his complaint quickly spawned numerous class actions by purchasers of Cree stock who alleged securities fraud during a period beginning on August 12, 1999, when Cree filed an annual report on SEC Form 10-K, and ending on June 13, 2003, the day after Eric Hunter filed his suit, purportedly revealing the truth of Cree's fraud during the previous years. The cases were consolidated in the Middle District of North Carolina, and Teachers' Retirement System of Louisiana was named the lead plaintiff. In a consolidated class

action complaint, Teachers' Retirement System and the other plaintiffs (collectively, "plaintiffs") sought certification of a class of all purchasers of Cree's common stock during the period from August 12, 1999 to June 13, 2003. The consolidated class action complaint named Cree, as well as six of the corporation's officers and directors, F. Neal Hunter, Cynthia B. Merrell, Dolph W. Von Arx, Charles Swoboda, Walter L. Robb, and John W. Palmour, as defendants (often hereafter referred to collectively as "Cree").

Count I of the consolidated class action complaint alleged that Cree violated § 10(b) of the Securities Exchange Act ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibits making false or misleading statements in connection with the sale of securities. Count II claimed that the individual defendants violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which assigns joint and several liability to a person who controls another who violates a securities regulation. The district court granted the defendants' motion to dismiss that complaint for failing both to plead fraud with particularity and to plead facts supporting a strong inference that Cree acted with scienter. *See In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 474-75 (M.D.N.C. 2004).

In response, the plaintiffs filed the first amended consolidated class action complaint (hereafter, "the complaint"), at issue in this appeal. The complaint bolstered the allegations made in the original consolidated class action complaint and named two more Cree directors as defendants, Calvin H. Carter and James E. Dykes. Additionally, the complaint added Counts III, IV, and V. Count III alleged that the individual defendants engaged in insider trading, in violation of § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a). Count IV claimed that the individual defendants are personally liable under § 18 of the Exchange Act, 15 U.S.C. § 78r(a), for making misleading statements. Count V claimed that Neal Hunter, Swoboda, and Merrell violated § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, which requires CEOs and CFOs to reimburse their corporations for bonuses and other compensation if the corporation is required to prepare an accounting restatement due to misconduct.

Each of the counts relies on allegations that Cree misrepresented a series of its transactions with six other companies over a period of

46 months in an effort to artificially inflate the price of its stock. The complaint alleges that Cree engaged in a "channel-stuffing" scheme with Charles & Colvard ("C&C"), by which Cree forced C&C to purchase silicon carbide crystals far in excess of C&C's need and then booked the unqualified revenue from the sales of these crystals even though C&C held an undisclosed right to return the crystals later on. It also alleges that Cree improperly booked revenue from a research and development agreement with C&C and a sale of equipment to C&C, because these transactions were a sham.

The complaint further alleges that Cree engaged in "round-trip" transactions with five other companies, Microvision, Inc., Spectrian, Inc., World Theatre, Inc., Xemod, Inc., and Lighthouse, Inc. "Round-tripping" typically refers to reciprocal agreements, involving the same products or services, that lack economic substance but permit the parties to book revenue to improve their financial statements. The putative pattern of these deals as alleged in the complaint was that Cree would intentionally overpay for an investment in the stock of the other company in exchange for the other company's agreement to purchase bogus R&D services from Cree.

Although Cree disclosed aspects of these transactions in its public filings, the plaintiffs' complaint alleges that the true nature of the transactions became known only when Eric Hunter filed his action against Cree, his brother, and other officers of Cree in June 2003. The complaint alleges that what was learned in June 2003 differed from what Cree had disclosed publicly and that the public disclosures were materially misleading.

Cree filed a motion to dismiss plaintiffs' amended class-action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion in its entirety, finding that the complaint's impressive length did not portend similarly impressive substance. The court concluded first that "plaintiffs adequately iden-tif[ied] the statements [of Cree] they believe[d] to be false and the reasons why they believe[d] them to be false, but fail[ed] to state with particularity facts supporting a strong inference of fraud." Second, the district court concluded that plaintiffs did not adequately plead that the defendants acted with the requisite scienter because the complaint neither identified misleading statements or omissions nor alleged suf-

ficient circumstantial evidence of scienter. Finally, the court found that "plaintiffs . . . failed to demonstrate a direct relationship between their losses and the alleged misrepresentations and have failed, therefore, to establish the required element of loss causation."

Having dismissed the first count alleging a claim under § 10(b) and Rule 10b-5, the court also dismissed plaintiffs' claims under §§ 20(a) and 20A of the Exchange Act because these claims depended upon the liability alleged in the first count. Similarly, the court dismissed plaintiffs' claim pursuant to § 18 of the Exchange Act because plaintiffs failed to plead facts showing that Cree made false statements. Finally, the court dismissed plaintiffs' claim under § 304 of the Sarbanes-Oxley Act because plaintiffs did not allege that Cree was required to issue any restatement of its financial reports.

From the district court's final order dismissing the complaint with prejudice, the plaintiffs filed this appeal, challenging each of the district court's grounds for dismissal and seeking either the reinstatement of their complaint or leave to amend it. Cree urges us to affirm the district court's order or, in the alternative, to find that the complaint was barred by the applicable statute of limitations. Cree argues that in a securities fraud case such as this, the limitations period began to run when a reasonable investor would have "inquiry notice" of potential fraud, citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

II

The district court dismissed the plaintiffs' class-action complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "PSLRA"). Because the district court's order ruled on the legal sufficiency of the complaint, we review that order de novo. *See Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006).

Ordinarily, the legal sufficiency of a complaint under Rule 12(b)(6) is determined by whether the complaint states a claim upon which relief can be granted in light of the pleading requirements of Rules 8 and 9, as well as the larger design of the Federal Rules. This design provides for simplicity in pleading that intends to give little more than

notice to the defendant of the plaintiff's claims and that defers until after discovery any challenge to those claims insofar as they rely on facts. Of course, the issue of whether the plaintiff is pursuing a claim upon which relief can be granted is a purely legal question that can be determined at virtually any stage of the federal process — in the beginning, under Rule 12(b)(6); after the pleadings have been filed, under Rule 12(c); after discovery, under Rule 56; or after the plaintiff has presented his case at trial, under Rules 50(a) or 52. When the issue of whether a complaint states a claim upon which relief can be granted is raised by a Rule 12(b)(6) motion and is dependent on the development of facts, however, the jurisprudence of Rule 12(b)(6) requires postponement of any final determination of the issue.

More precisely, under this scheme of notice pleading and broad discovery, consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery. As the Supreme Court has characterized this approach to Rule 12(b)(6) motions:

> Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted *under any set of facts that could be proved consistent with the allegations*.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal quotation marks and citation omitted) (emphasis added). Of course, when the matters alleged in the complaint are taken as true and the complaint still fails to state a claim upon which relief can be granted, it will be dismissed at the outset, under Rule 12(b)(6). *See Jordan*, 458 F.3d at 338.

Some have criticized this design of federal procedure as encouraging the filing of frivolous suits that have little hope of success and are designed to harass the defendant. The Supreme Court in *Swierkiewicz* considered the defendant's similar argument that "allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits." 534 U.S. at 514. The Supreme Court responded:

> Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits. A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Id.* at 514-15 (internal quotation marks and citations omitted).

To address just the type of argument that the defendant advanced in *Swierkiewicz*, the Federal Rules of Civil Procedure require particularized pleadings in specific types of cases, including those alleging fraud. Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The reasons that have been given for applying this heightened pleading standard in fraud cases are numerous and continue to be debated. *See generally* 5A Charles Alan Wright & Arthur M. Miller, *Federal Practice and Procedure* § 1296 (3d ed. 2004). But one repeatedly given reason is summarized as follows:

> [S]ome federal courts have expressed the view that allegations of fraud or mistake frequently are advanced only for their nuisance or settlement value and with little hope that they will be successful on the merits; indeed, there actually may be little or no incentive to secure the adjudication of the claim in some instances. Thus, unfounded fraud claims should be identified and disposed of early.

*Id.* at 37. Professors Wright and Miller also note, with particular relevance to the case before us, that this justification for Rule 9(b) encap-

sulates the goal of sorting out at an early stage "strike suits" in the securities field. *Id.* at 45-47.

Yet, the inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA. As the Committee of Conference that reported the PSLRA noted, "[Rule 9(b)] has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits." H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. The Committee of Conference stated that it was reacting to testimony on the need to establish "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits," and therefore intended "to strengthen existing pleading requirements." *Id.* Thus, the PSLRA was enacted in response to evidence presented to the Committee that

> abusive practices committed in private securities litigation include . . . the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action.

> * * *

> This legislation implements needed procedural protections to discourage frivolous litigation.

*Id.* at 730-31.

The PSLRA provides that in pleading a material misrepresentation or omission, in violation of § 10(b) of the Exchange Act and Rule 10b-5, and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead *facts*. *Cf.* Fed. R. Civ. P. 8(a)(2) (providing that a pleading generally need only contain "a short and *plain statement of the claim* showing that the pleader is entitled to relief"

(emphasis added)). Thus, in alleging misrepresentations or omissions under the PSLRA, a complaint must include "*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). The PSLRA also directs that any complaint not meeting the pleading requirements be dismissed, *id.* § 78u-4(b)(3)(A), and that during the pendency of any motion to dismiss, discovery be stayed, subject to exceptions, *id.* § 78u-4(b)(3)(B).

Thus, while the Federal Rules generally allow a court, in ruling on a motion to dismiss under Rule 12(b)(6), to take into account *any set of facts that could be proved* consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff *to plead facts* to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission. 15 U.S.C. § 78u-4(b)(1). The Act also requires a plaintiff to plead sufficient facts to raise a *strong inference* of scienter. *Id.* § 78u-4(b)(2). Of course, the other elements of a securities fraud claim would be analyzed under the traditional pleading scheme of Rules 8 and 9, since Congress only addressed misrepresentations and scienter in § 78u-4(b).

In purporting to allege claims under § 10(b) and Rule 10b-5, the plaintiffs were required to allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages."[2] *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42

---

[2]Breaking down these elements further, the Supreme Court recently stated:

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:

F.3d 204, 208 (4th Cir. 1994). In dismissing the plaintiffs' complaint, the district court held the complaint to be wanting as to elements (1) (misrepresentation or omission), (2) (scienter), and (4) (loss causation). Thus, with respect to elements (1) and (2), we will apply the pleading standard created by the PSLRA, and with respect to element (4) — that the misrepresentation caused the plaintiffs' loss — we will apply the general pleading standards of Rules 8 and 9, as applicable to any fraud claim.

## III

In dismissing the plaintiffs' complaint, the district court concluded first that the complaint failed to satisfy § 78u-4(b)(1)'s heightened requirements for pleading misrepresentations or omissions. While it found that the complaint adequately specified the allegedly misleading statements and the reasons why they were misleading, it concluded that, with respect to every single statement, the complaint fell short of alleging facts sufficient to support the plaintiffs' information and belief that the statements were misleading, as required by § 78u-4(b)(1).

---

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see *Basic* [*Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988)] (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in the absence);

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted).

Section 78u-4(b)(1) provides:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant —
>
> > (A) made an untrue statement of a material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall *specify each statement* alleged to have been misleading, *the reason or reasons why the statement is misleading*, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added). Thus, plaintiffs must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, "with particularity *all facts* on which that belief is formed."

The "all facts" requirement is imposed for several reasons. First and most obviously, it is included to determine the legal sufficiency of the complaint under Rule 12(b)(6). Under Rule 12(b)(6), a complaint is legally sufficient if it "state[s] a claim upon which relief can be granted." As explained above, under the generally applicable notice pleading rules, this standard requires the court to ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations that would permit relief to be granted. *See Swierkiewicz*, 534 U.S. at 514. The PSLRA's "all facts" standard, however, changes the relevant set of facts for alleging misrepresentations and omissions to those alleged in the complaint. Under the PSLRA, therefore, our inquiry becomes whether, if those facts alleged in the complaint are true, relief could be granted on the plaintiffs' claim. Stated another way, we must ascertain whether the complaint states *sufficient*

*facts* to permit a *reasonable* person to find that the plaintiff satisfied this element of his claim — that the defendant made a false or misleading statement.

If the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (endorsing *Novak*'s standard); *California Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (same); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003) (same). This construction of § 78u-4(b)(1) logically follows from the inquiry required by Rule 12(b)(6), which tests only the *legal sufficiency* of the complaint.

In interpreting § 78u-4(b)(1)'s "all facts" standard in the context of a Rule 12(b)(6) motion to require a pleading of "sufficient facts," we do not read the "all facts" standard out of the statute. It remains relevant to other aspects of the court's supervision of securities fraud class action litigation. For example, the court must be able to determine whether some discovery will be permitted, despite the general bar against discovery pending motions to dismiss. *See* 15 U.S.C. § 78u-4(b)(3)(B). Having the assurance that *all facts* upon which the plaintiffs' belief is based could be relevant in making this decision. The court might be similarly assisted in supervising the preservation of evidence "relevant to the allegations" under § 78u-4(b)(3)(C). And of course, at the conclusion of every lawsuit covered by the PSLRA, the court must make specific findings as to the parties' compliance with Federal Rule of Civil Procedure 11(b) as it applies to "*any complaint*, responsive pleading, or dispositive motion." *See id.* § 78u-4(c)(2) (emphasis added).

Reading § 78u-4(b)(1) to require the pleading of *all* facts which support a plaintiff's belief on the sanction of dismissal authorized by § 78u-4(b)(3)(A) could theoretically lead to some harsh results in the management of discovery and PSLRA litigation in general. *See Novak*, 216 F.3d at 314 (discussing these possibilities). But since Rule 12(b)(6) focuses on whether the complaint states a claim upon which

relief "*can be granted*," we need only determine in the circumstances before us whether plaintiffs' complaint alleges *sufficient facts* upon which a *reasonable belief* can be formed that Cree's representations or omissions were misleading.

Determining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole. We will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading. *See Adams*, 340 F.3d at 1102-03; *Chubb Corp.*, 394 F.3d at 147-55. When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources "with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged' or in the alternative provide other evidence to support their allegations." *Tellabs, Inc.*, 437 F.3d at 596 (*quoting Novak*, 216 F.3d at 314).

The complaint at issue here adequately specifies the statements alleged to have been misleading and the reasons why they were misleading. Indeed, it identifies no less than 48 statements publicly made over nearly four years regarding Cree's transactions. But after each misleading statement, the complaint simply repeats a formulaic set of allegations why, upon "information and belief," the statement was misleading. The facts alleged in support of these formulaic reasons fail to support a reasonable belief that the statements were in fact misleading, and therefore we conclude that the complaint fails to satisfy the PSLRA and Rule 12(b)(6)'s requirement that the complaint shall state with particularity sufficient facts on which a reasonable belief can be formed. This becomes clear when we consider the facts supporting the allegations about each transaction.

A.  *C&C Crystal Supply Agreement, R&D Agreement, and Equipment Sale*

In multiple public filings from 1997 to 2002, Cree disclosed two agreements entered into with Charles & Colvard ("C&C"), a company founded in 1995 by Eric Hunter and then managed by his brother, Jeff

Hunter. One agreement was a long-term supply agreement, dated June 6, 1997, in which C&C agreed to purchase half of its requirements for silicon carbide crystals from Cree during each calendar quarter. Cree, in turn, agreed to supply specific quantities and colors of crystals exclusively to C&C. The agreement also provided that if C&C would order more crystals than Cree had a capacity to produce, C&C would have the right either to reduce the quantity of its order or to purchase crystal-growing equipment from Cree. If C&C opted to purchase equipment, Cree would construct the equipment on its premises to produce the additional crystals for C&C, and C&C would become obligated to purchase at least six months' output from the new equipment. After the equipment was fully depreciated, C&C would be required to transfer title to the equipment to Cree.

Under the second agreement, entered into at the same time as the crystal supply agreement, C&C agreed to pay Cree for research and development of colorless silicon carbide crystals. As amended in 1998, this agreement required C&C to pay Cree for R&D efforts at a level totaling $2.88 million annually for four years. In an amendment in May 1999, however, the parties lowered the level of R&D to $1.44 million annually.

For fiscal year 1999, Cree reported booking $11.4 million in revenue from the agreements, and in fiscal year 2000, $16.2 million. These sales were boosted by C&C's exercise of its option to purchase equipment in May 1999 for Cree's production of more silicon carbide crystals. As disclosed that month, this decision triggered C&C's contractual obligation to purchase the output of the new equipment over the next two years. C&C's payments during these years constituted a substantial portion of Cree's revenue for the relevant periods. For instance, sales of silicon carbide crystal materials to C&C for the second half of the calendar year 1999 represented 35% of Cree's revenue for the period.

In late 1999, C&C's fortunes began to take a downward turn, and C&C's need for silicon carbide crystals thereafter steadily declined. Cree disclosed in its January 3, 2000 SEC registration statement that C&C's sales were slow and inventory had grown, and Cree acknowledged that "a substantial portion of [its] revenue has come from large purchases by a small number of customers," of which C&C was one.

Cree reported that it "anticipate[d] that sales to [C&C] will decrease in calendar 2000" and that Cree "agreed that [C&C] could reschedule approximately one-half of its purchase commitments from the first half of calendar 2000 to the second half of the year." In April 2000, Cree disclosed in its quarterly report that, due to C&C's anemic sales and high inventory, "We anticipate that overall sales to [C&C] will decrease to less than 10 percent of our revenue for the fourth quarter of fiscal 2000, and will continue to decline as a percentage of revenue through the first half of 2001." Likewise, in February 2001, Cree's quarterly report stated, "We anticipate little or no revenue from the gemstone business over the next several quarters as [C&C] balance[s] their inventory levels. C&C sales made up approximately 5% of total revenue during the second quarter of fiscal 2001." By May 2001, Cree reported that it had made no sales to C&C in the third quarter of 2001 and expected "little to no revenue" from C&C in the several upcoming quarters. Because C&C's weakening sales hindered its ability to pay for Cree's crystals, Cree repurchased the crystal-growing equipment that it had constructed and sold to C&C, financing the purchase by giving C&C a $5 million credit against C&C's future crystal purchases. C&C disclosed this equipment sale in its own April 2000 quarterly report.

Plaintiffs' complaint alleges that Cree's disclosures were false or misleading because Cree's arrangement with C&C was a "channel-stuffing" scheme, by which Cree "exerted actual control over C&C" in their business dealings and caused "C&C to purchase SiC [silicon carbide] materials in excess of its demand for such materials, knowing that such purchases were leading to excessive inventory buildup" and which signaled "growth in recurring business that did not exist." The complaint also alleges that Cree overstated its revenues by booking "payments by C&C for SiC material which C&C had a right to reject and return." The complaint alleges that Cree overstated its revenues by "book[ing] payments from C&C for Cree's R&D work as revenue when Cree never conducted such R&D work." Finally, the complaint alleges that Cree fraudulently "booked revenues from the sale of equipment to C&C, and booked that transaction as a sale to C&C followed by Cree's repurchase of the equipment when no such sale and repurchase had occurred."

The complaint, however, completely fails to include facts sufficient to permit a reasonable belief that Cree exercised any control over

C&C and caused C&C to purchase unneeded crystals in a "channel stuffing" scheme. Far from impeaching the truth of Cree's public disclosures, the facts alleged in the complaint are consistent with the performance of the publicly disclosed supply contract, which obligated C&C to purchase certain outputs of crystals. The complaint alleges testimony of a former Cree process engineer who observed Cree selling consistent quantities of silicon carbide crystals to C&C during 2000 — precisely what the publicly disclosed supply contract called for. It also includes the statement of a confidential source, an undisclosed former C&C director of technology, who stated that "C&C spent money like 'drunken sailors' by regularly writing checks to Cree for $200,000-$300,000." This, too, is indicative of C&C's actual payments to Cree pursuant to the contract. To the extent that the complaint alleges that Cree somehow forced C&C to enter the supply contract, the facts are even more wanting. The complaint's only support of this claim is that managing officers from the two companies were related and met periodically to negotiate and supervise the agreements. It is impossible to infer from this that the publicly disclosed agreements were fraudulent.

To plead facts sufficient to permit a reasonable belief that Cree improperly booked sales of silicon carbide crystals to C&C, the complaint depends on the existence of a right of C&C to return the crystals. The complaint works under the assumption that Cree would not have been entitled to book the sales if C&C had purchased the crystals on the condition that they could be rejected and returned. Even if this assumption were correct, the complaint fails to provide facts from which a reasonable person could conclude that C&C held any such right of return. Moreover, the complaint fails to suggest that Cree ever had to adjust its revenues due to any returns of crystals from C&C. If such a right of return had existed and the purchases were a sham, one would expect that C&C would have exercised the right of return, requiring Cree to adjust its books. Yet, no such scenario is even suggested in the complaint.

Instead, the complaint relies on two personal sources who alleged that Cree concealed C&C's right of return — Eric Hunter and an unidentified former Cree process engineer. First, Eric Hunter's statement cannot reasonably be taken to support such an agreement because his service as a Cree officer ended in 1994 — three years

before the class period began — and the complaint provides no basis for his assertions about the Cree-C&C agreements. While Eric Hunter was under contract as a Cree employee during the class period, the complaint states that Eric Hunter never actually performed work under the contract. Nor does the bare fact that Eric Hunter is the brother of Neal Hunter help because the complaint does not allege that Neal Hunter ever communicated with Eric Hunter regarding Cree's operations. To the contrary, Eric Hunter's personal complaint filed against Cree in June 2003, which the plaintiffs incorporated in their complaint, alleged that Neal Hunter and other Cree officials harassed, threatened, intimidated, and defamed Eric Hunter and his family. The complaint's allegations based on Eric Hunter's statement do not, in short, support a reasonable belief that Cree afforded C&C a secret right to return silicon carbide crystals.

The complaint's second source alleging a secret right of return is a "former Cree process engineer who worked as the lead engineer on and manager of the C&C product line" from mid-2000 to mid-2001. This source stated that in his last few months of his employment (i.e., early 2001), C&C began rejecting large quantities of crystals. He claimed that "the rejected products were kept in C&C's facilities to create justification as to why Cree was not required to create a reserve or take a charge for the purportedly rejected and nonconforming goods." But these facts are not meaningful in light of the settled, publicly disclosed history. By early 2001, Cree's sales to C&C had slowed to a trickle; Cree reported booking no revenue from sales to C&C in January to March 2001 and expected "little to no revenue" in the subsequent quarters. Thus, even if this source correctly recalls C&C rejecting large shipments of silicon carbide crystals from Cree, he is simply wrong regarding Cree's revenue recognition methods. Cree booked no sales to C&C during this time.

Finally, this leaves the complaint's allegations that Cree improperly booked revenue for R&D that it never performed and that Cree improperly accounted for the crystal-growing equipment transaction. Again, these allegations rest entirely upon Eric Hunter's assertions. As discussed above, the complaint advances insufficient facts to show how Eric Hunter could have had any access to this information and therefore fails to satisfy PSLRA's stringent requirements for pleading misleading statements or omissions.

### B.   *Microvision Investment and R&D Agreement*

In its 1999 annual report, Cree reported that in May 1999, it purchased $4.5 million of the stock of Microvision, Inc., a Washington corporation. At the same time, Microvision agreed to pay Cree $2.6 million for research and development on light-emitting diodes.

In its quarterly report of April 2000, Cree reported that on March 17, 2000, it purchased an additional 250,000 shares of Microvision, when Microvision stock was trading at $63.75. The stock purchase agreement contemplated a closing on April 13, 2000, and provided for a revision of the purchase price to $50 per share if Microvision's share price dropped substantially by that date. Because Microvision's shares in fact traded at $36.88 at the closing date, Cree paid Microvision $50 per share ($12.5 million), in accordance with the agreement. Microvision's quarterly report of March 30, 2000, discloses that, at that time, Microvision also entered into an identical stock purchase agreement with General Electric.

In its April 2000 quarterly report, Cree also disclosed that Cree and Microvision had amended their prior R&D contract, bringing its total value to $12.6 million over two years. In its 2000 annual report, Cree stated that it would apply this funding from Microvision to reduce Cree's R&D expenses over fiscal years 2000, 2001, and 2002.

Also in its 2000 annual report, Cree disclosed that in June 2000, it sold 162,200 of its Microvision shares, realizing a $3.6 million gain. Microvision's shares, however, steadily declined in value thereafter, and Cree ultimately sold the remainder of the stock in December 2002 for $1.8 million.

Plaintiffs' complaint alleges that Cree misrepresented what, in reality, were meaningless "round-trip" transactions with Microvision, entered into only for purposes of creating "sham" income. The complaint alleges that Cree intentionally overpaid in making its $12.5 million investment in Microvision, paying $50 per share when Microvision's shares traded at $36.88. The complaint alleges that Cree made this overpayment in exchange for Microvision's return of the money in payments for "sham" R&D work, which neither company intended Cree to actually perform. The complaint further alleges

that rather than using the payments for R&D to perform research beneficial to Microvision, "Cree simply continued doing the very same research it had been doing in the ordinary course of business." The alleged goal of the Microvision deal was to reduce Cree's R&D costs and thereby overstate its net income.

A typical "round-tripping" scheme involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services. *See, e.g.*, *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1024-25 (C.D. Cal. 2003) (describing the bartering of like services to artificially inflate revenues). Such transactions can be improper because the parties book revenues even though the transactions "wash out" without any economic substance. But the basis for alleging "round-tripping" does not exist when either of the transactions have economic substance because those transactions would not wash out. The mere existence of reciprocal dealing does not suggest "round-tripping." Indeed, it is a common, legitimate, and perhaps useful business practice for one company to invest in the stock of a second company with which it is entering into a major contract for products or services.

The plaintiffs do not allege the usual "round-tripping" exchange of like services. Instead, their theory is that Cree paid an extra amount of money for Microvision's stock beyond its market value, and that Microvision returned that excess amount in the disguise of a payment for R&D work that Cree did not actually perform. This allegation of round-tripping is plausible, however, only if both transactions involve this same excess amount of payment and otherwise lack economic substance. If either transaction has economic substance, the transactions cannot be a wash, and there would be no artificial inflation of revenue. Thus, the complaint must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham, washing each other out. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the claim is one that simply makes no economic sense — [the plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary").

The complaint fails adequately to allege facts supporting the conclusion that either leg of Cree's "round-trip" transactions with

Microvision lacked economic substance. As to Cree's intentional overpayment, plaintiffs rely solely on the fact that Cree paid $50.00 per share when Microvision's shares were trading at $36.88 on the deal's closing date. The public filings about this transaction show, however, that Cree's agreement to invest in Microvision was signed when Microvision's shares were trading at $63.75. Moreover, the agreement provided a neutral formula that established a purchase price of $50.00 if Microvision's share price dropped substantially by the closing date. Because Microvision's share price in fact dropped, the agreement operated to fix the price at $50.00 per share. It is noteworthy that Microvision's quarterly report of March 30, 2000, shows that Microvision also entered into an identical stock-sale agreement with General Electric. These facts do not support a reasonable belief that Cree *intentionally* overpaid for its investment in Microvision.

As for the second leg of this alleged "round-trip" — that Cree provided no R&D for Microvision's payments — the complaint relies on statements from two confidential sources besides Eric Hunter. An unnamed former Microvision project manager who purportedly had "personal knowledge of the contract between Cree and Microvision" stated that the R&D contract "made no mention of the development of improvements in blue and green laser devices for mobile handsets" and that "the contract did not contain any milestones or deadlines for the development of any products." But the actual contract belies these statements, providing that "Cree will undertake . . . the development of blue and green LEDs and LDs useful in scanned beam display systems." Additionally, the contract lays out specific program goals and deadlines. Given this source's evident lack of familiarity with the R&D contract, the facts he stated cannot support the complaint's assertion that Cree performed no R&D work.

Plaintiffs' second basis for impugning the R&D contract was statements from a confidential former Microvision R&D director, who stated that his position gave him knowledge of Microvision's "internal and external research projects." But the complaint also states that Microvision and Cree officials denied that director access to information about the R&D agreement. Thus, this source's only firsthand testimony is that *he did not know* whether Cree performed R&D work. Yet, plaintiffs argue that these allegations support the belief that Cree

in fact performed no other R&D work for Microvision. Fraud is not a reasonable inference to be drawn from the statements of this source.

### C.   *UltraRF Acquisition and Spectrian R&D Agreement*

The complaint also alleged a "round-tripping" arrangement with Spectrian. In a January 2001 SEC filing, Cree disclosed that in December 2000, it had acquired UltraRF, a division of Spectrian located in Sunnyvale, California, for $100 million. UltraRF was engaged in the design and manufacturing of transistors and laterally diffused metal oxide semiconductors ("LDMOS"). At the same time, Cree also announced that Spectrian agreed to pay Cree $2.4 million for the further development of LDMOS devices for Spectrian and to purchase from Cree $58 million of UltraRF/Cree products over a period of two years. In March 2001, Cree amended its January filing, reporting that it had allocated $81.6 million of its purchase price for UltraRF to goodwill.

As it turned out, UltraRF/Cree reported better-than-expected revenues in fiscal 2001 of $19.2 million, of which about 90% came from its sales to Spectrian. Cree's May 2001 quarterly report spoke of UltraRF with cautious optimism: "In the long term, UltraRF's success will depend on the rate at which we diversify our Spectrian-concentrated business. . . . We believe that LDMOS product line will enable growth of our products to customers other than Spectrian." During the first quarter of fiscal 2002, Cree announced that the high level of sales from its UltraRF operations continued, reporting another $9.6 million in revenue.

Cree, however, began to have trouble developing a newer LDMOS device, dubbed "LDMOS-8," which Spectrian required. In its February 2002 quarterly report, Cree announced that the companies had modified the supply agreement in October 2001 to push back Spectrian's purchases to the two subsequent quarters and give Spectrian a $2.1 million credit if UltraRF/Cree did not meet specified development goals. In a March 12, 2002 press release, Cree announced that it expected to complete the LDMOS-8 development and to deliver it during the fourth quarter of fiscal 2002. But it also stated that the delays prompted Cree to consider writing down UltraRF's goodwill in a one-time charge of $60 to $77 million. Cree's May 2002 quar-

terly report disclosed that the companies again modified the supply agreement to extend it by six months and reduce Spectrian's total purchase commitment to $54.8 million, subject to further reduction if Cree did not complete the development of the LDMOS-8 technology. The quarterly report also disclosed that Cree wrote down the entirety of UltraRF's goodwill in March 2002, having determined that its value was fully impaired.

During the course of a July 30, 2002 conference call, the defendants Merrell and Swoboda stated that Cree had achieved important development milestones in the LDMOS devices and expected testing to be completed by September 2002. But Cree's annual statement, filed August 19, 2002, was less optimistic and simply stated, "If we are unable to complete the full product qualification process and ramp up production of our recently released LDMOS-8 products adequately, Spectrian may reduce the amount it purchases during the applicable quarter under the agreement."

The next quarterly report dated October 29, 2002, disclosed that UltraRF/Cree's sales to Spectrian in that quarter totaled only $190,000. It also disclosed that the amended supply agreement "permits Spectrian to significantly reduce its purchase obligations if we were not able to complete our qualification of our LDMOS-8 products prior to the end of the first quarter of fiscal 2003 and for each subsequent month until those parts are qualified."

Finally, in Cree's January 31, 2003 quarterly report, Cree disclosed that the LDMOS-8 development delays caused Spectrian to cancel the supply agreement with a final $5 million payment in late 2002, as the agreement allowed.

Plaintiffs' complaint alleges that the truth of the matter was that Cree engaged in "round-tripping" with Spectrian and that Cree "intentionally overpaid for UltraRF with the understanding that the overpayment would be returned to Cree as revenues under the Supply Agreement." The complaint further alleges that Cree's disclosures were misleading because they failed to disclose that "prior to the acquisition, Cree knew it did not have the ability to perform the R&D contemplated in Cree's agreements" and that "Cree never performed the R&D work required under its agreements with Spectrian."

The fact that Cree ultimately had to write down the value of UltraRF's goodwill or was unable to develop the LDMOS-8 technology in a timely fashion does not mean that Cree fraudulently overpaid for UltraRF or neglected to conduct LDMOS-8 research and development. These facts are just as consistent with Cree having taken a risk in the hope of securing profits, and it is well known that the risks are great in high-technology industries, such as Cree's. A failed venture, standing alone, does not permit a reasonable inference of fraud.

The complaint's primary basis for this allegation is the fact that the purchase price exceeded UltraRF's book value by about five times, forcing Cree to allocate approximately $81.6 million of the acquisition price to goodwill. While this fact, standing alone, might signal that Cree made an investment that carried great risk, and indeed potential for reward, it does not suggest an excessive price, much less a fraudulent price. A "fair" acquisition price depends on a wide variety of factors, including market value, dividends, earning prospects, the nature of the enterprise, and "any other facts . . . which throw any light on future prospects." *See Viacom Int'l, Inc. v. Icahn*, 946 F.2d 998, 1000-01 (2d Cir. 1991).

Most telling is the fact that the complaint is devoid of particular facts that speak to a fraudulent valuation of UltraRF at the time it was acquired. It relies on conclusory and hardly probative statements by four confidential sources besides Eric Hunter. For example, a Cree technician asserted that "it was well-known within Cree that they had overpaid for a company with dim prospects," but the complaint does not tie this "well-known" sentiment to any particular date or persons. In hindsight, Cree employees likely regretted the UltraRF acquisition, but this does not mean Cree knew *ex ante* that the investment would sour. Also, a former employee in Cree's IT department asserted that Cree was "'very aggressive' in cutting deals for Cree" and "would 'move the line' when necessary." This vague statement also provides no particularized fact that supports the belief that Cree intentionally overpaid for UltraRF. A former assistant to the president of Spectrian's UltraRF division asserted that UltraRF had no "saleable" products and that "the division would be worth its total value in facilities and infrastructure or between $5 million and $10 million." The complaint does not say, however, how this person would know this information or would have expertise in valuing a business. Moreover, his

assessment appears to be contradicted in the complaint by the fact that UltraRF, after being acquired by Cree, did sell approximately $30 million of products to Spectrian. Whether Spectrian found the products useful is immaterial; for Cree's purposes, these were bona fide sales because "real products were shipped to [a] real customer[ ] who then paid with real money." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004).

The complaint also fails to support the allegations of the second leg of the alleged round-trip with Spectrian — the "sham" product sales and R&D agreement. The complaint's basic problem is that the facts it alleges do not contradict Cree's public disclosures. Cree and Spectrian disclosed that Spectrian committed to purchase certain levels of UltraRF products, which is precisely what happened. The complaint assigns a sinister motive to the deal, in light of UltraRF's ultimate failure, but, as we noted above, there are no facts to support this claim or belief. To be sure, reciprocal contracts without more are not per se fraudulent.

In an attempt to cure their deficient pleading, plaintiffs' complaint alleges that Cree concealed what it knew upon entering the agreements with Spectrian in December 2000 — that UltraRF/Cree would be able neither to develop the LDMOS technology nor to attempt to develop it. The complaint proffers just one confidential source to support this allegation, a Spectrian vice president of operations who stated baldly, "Cree never performed any real R&D for Spectrian," and who called Cree's R&D work "smoke and mirrors." The complaint does not allege facts to support how this source would know that UltraRF/Cree performed no "real" R&D work for Spectrian. Moreover, even this source's observations, if they were in fact observations, do not support the conclusory allegation that Cree knew, when it entered into the R&D agreement, that it could not perform it.

In short, the complaint fails to plead with particularity facts that Cree made any misleading disclosures with respect to the Spectrian transactions.

### D.    *WTI, Xemod, and Lighthouse Investments and R&D Agreements*

Plaintiffs' complaint also alleges, in far less detail, that Cree entered into undisclosed "round-tripping" arrangements with three

other technology firms — World Theatre, Inc. ("WTI"), Xemod, Inc., and Lighthouse, Inc. The pattern alleged was that Cree overpaid for investments in those firms in exchange for the firm's promises to pay Cree for R&D services with the knowledge that Cree would not actually perform the services.

With respect to the WTI arrangement, Cree filed a preliminary proxy on SEC Form PRE 14A in September 2000, which disclosed that in April 2000, Cree had invested $5 million in WTI. In the definitive proxy statement filed three weeks later, Cree disclosed that in late 2000, WTI entered into a four-year development agreement with Cree and that WTI had exercised its option to terminate that agreement in March 2001. In Cree's 2003 annual statement, filed in September 2003, Cree disclosed that it had taken several write-downs of its WTI investment, recognizing its value to be impaired. These write-downs occurred in the fourth quarter of fiscal 2001 in the amount of $750,000, in the second quarter of fiscal 2002 in the amount of $2.1 million, and in the fourth quarter of fiscal 2002 in the amount of $2.1 million.

Plaintiffs' complaint alleges that Cree knowingly overpaid for its investment in WTI and hid this fact by failing to disclose the write-downs until September 2003, over a year later. The complaint does not, however, make any allegations regarding the legitimacy of the development agreement that existed briefly between the companies.

With respect to Xemod, Cree announced in a press release on September 20, 2000, that it had invested $11.3 million in Xemod, a privately-held developer and maker of amplifier components for wireless communications. At some point, Cree also invested in an affiliate of Lighthouse, Inc., though the record contains no specific disclosure by Cree of the Lighthouse investment. Cree's 2003 annual statement, however, filed in September 2003, disclosed a series of write-downs that Cree took on its investments in Xemod and Lighthouse. In the fourth quarter of 2001, Cree took a write-down of $2.4 million on Xemod and $1.4 million on Lighthouse; in the second quarter of fiscal 2002, Cree took an $8.4 million write-down on Xemod and $1.8 million on Lighthouse; and in the fourth quarter of 2002, it took a $3.4 million write-down on Lighthouse. Cree's 2003 annual statement further disclosed that Cree had completed R&D agreements with Xemod

and Lighthouse in the recent past. Under these agreements, the two companies paid Cree $500,000 in 2001, $3.5 million in 2002, and $5.2 million in 2003.

Plaintiffs' complaint alleges that Cree intentionally overpaid for its investments in Xemod and Lighthouse in exchange for those companies returning the funds to Cree for "sham" R&D work. The complaint also alleges misrepresentations in that Cree did not disclose the existence of the investments or the development agreements until September 2003, even though some were executed as early as 2000. The record shows, however, that Cree did in fact disclose the write-downs on investments and developments with WTI, Xemod, and Lighthouse before 2003. Cree's annual reports in 2001 and 2002 described its write-downs on privately-held investments and R&D revenues in the aggregate. Cree's 2001 annual report disclosed that it took a $4.6 million write-down in the fourth quarter of fiscal 2001 "to establish a reserve for investments made in private companies that was considered to be other than temporary impairment to value." Cree's 2002 annual report discloses that it recorded a $20.4 million write-down on its privately held investments due to their impaired value. Cree explains that these disclosures related to the transactions about which the plaintiffs complain in their complaint.

The complaint alleges no documentary or personal source to support the allegation that Cree intentionally overpaid for these investments or failed to perform R&D pursuant to the agreements. It simply engages in pleading fraud by hindsight, noting that Cree had to write down these investments in fiscal years 2000, 2001, and 2002, and that Cree did not report these write-downs until it filed its 2003 annual report. Previous public filings of Cree, however, did report the write-downs, albeit in the aggregate, without breaking down which investments were overvalued and by what amounts. Even if Cree's choice of reporting method was improper accounting, which the complaint does not specifically allege, this method of reporting is not probative of plaintiffs' allegation of "round-tripping."

In sum, we affirm the district court's dismissal of the complaint on the ground that it fails to state with sufficient particularity facts needed to support the allegations that Cree made misleading statements.

## IV

For the second element of a securities fraud claim under § 10b of the Exchange Act and Rule 10b-5 thereunder, a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with "severe recklessness" regarding the danger of deceiving the plaintiff. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003). A showing of mere negligence will not suffice. *Id.*

The PSLRA significantly strengthens the requirement for pleading this scienter. Whereas Federal Rule of Civil Procedure 9(b) allowed a person's state of mind to "be averred generally," the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference* that *the defendant* acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). Thus, to allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a "strong inference" that *each* defendant acted with at least recklessness in making the false statement. *See Tellabs, Inc.*, 437 F.3d at 602-03; *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-67 (5th Cir. 2004). And if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents. *See Tellabs, Inc.*, 437 F.3d at 602-03; *Southland Sec. Corp.*, 365 F.3d at 363-67.

The district court held that if the plaintiffs' allegations were true, the complaint may have sufficiently alleged scienter through a series of attenuated inferences based on the positions that individuals held in Cree. But it concluded that any more probing scienter inquiry was rendered moot by its conclusion that the complaint failed to plead that the defendants made any misleading statement or omission. Because

no misleading statement or omission was sufficiently alleged, the defendants could not have made misrepresentations or omissions intentionally or with sufficient recklessness.

We agree with this conclusion. While the complaint does allege facts that demonstrate that at least defendants Neal Hunter, Merrell, and Swoboda had fairly intimate knowledge of the various relevant transactions, any inferences that could be drawn from the facts are immaterial because the statements or omissions about those transactions were not misleading.

In addition, other facts stated in the complaint are too circumstantial to give rise to a "strong inference" that the defendants acted with scienter. The complaint suggests that the defendants artificially inflated Cree's share price in order to profit from personal sales of Cree stock. But insider trading can imply scienter only if the timing and amount of a defendant's trading were "unusual or suspicious." *See, e.g.*, *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d at 390; *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). The complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud. The complaint does not allege that defendants timed their sales to profit from any particular disclosures, and defendants' sales generally occurred at prices that were not especially high for the class period. *See Ronconi*, 253 F.3d at 435 (finding defendants' sales did not suggest "knowing falsehood" when sales were made at prices well below the stock's high point). Thus, for example, while Cree's shares reached a high of $198 per share during the class period, over 75% of Neal Hunter's trades within the class period occurred when Cree's shares traded below $30 per share. Additionally, the complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period. *See id.* at 436 (faulting plaintiff for stating defendants' trading history for only seven months before class period).

The complaint does emphasize the number of shares that the defendants traded within the class period in relation to their total holdings of Cree stock. Specifically, the complaint alleges that Neal Hunter, Merrell, and Swoboda sold 92%, 100%, and 82%, respectively, of their Cree stock during the class period. But this allegation is unre-

markable without taking into account the defendants' vested stock options. Cree argues, for example, that because Merrell held some 369,200 vested stock options at the end of the class period, her trading within the class period would have to appear much less significant. In any event, the complaint does not provide the facts sufficient to generate the required "strong inference."

In addition, plaintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent scheme lasted some 46 months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." *See In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002). Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

V

Finally, the district court relied on plaintiffs' failure adequately to allege loss causation, the fourth element of a securities fraud claim under § 10b and Rule 10b-5. As we have held, a plaintiff must allege and prove that the defendant's misrepresentations proximately caused the plaintiff's economic loss — in this case, the diminution of the value of their shares. *See Hillson*, 42 F.3d at 208.

Loss causation is not one of the elements with respect to which the PSLRA imposes a more stringent pleading requirement. But the Act does explicitly state that a plaintiff must prove loss causation in that the defendants' material misrepresentations or omissions caused the drop in the stock's value. As the PSLRA provides:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4). Because the PSLRA explicitly requires that the plaintiff *prove* loss causation, the general rules of pleading require that the plaintiff also *plead* it in his complaint. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("our holding about plaintiffs' need to *prove* proximate causation in economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements").

Neither the PSLRA nor the Supreme Court has established whether loss causation is a sufficient part of an "averment of fraud" to fall within the requirements of Federal Rule of Civil Procedure 9(b). A strong case can be made that because loss causation is among the "circumstances constituting fraud for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity." *See Dura Pharm.*, 544 U.S. at 343-44 (comparing § 78u-4(b)(4) to a common law action for deceit which requires that a plaintiff "show not only that he had known the truth he would not have acted but also that he suffered actual economic loss"); *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 231-32 (4th Cir. 2004) (explaining loss causation to require a showing that "defendant's misrepresentation was a *substantial* cause of the loss by showing 'a direct or proximate relationship between the loss and the misrepresentation.'" (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996))). Moreover, the Supreme Court has not ruled out a holding that Rule 9(b) governs a pleading of loss causation. *See Dura Pharm.*, 544 U.S. at 346.

Even in the absence of an explicit holding, the *Dura Pharmaceuticals* Court concluded that a plaintiff does not state a claim upon which relief can be granted — even under the relaxed pleading requirements of Rule 8(a) — by simply alleging that the plaintiff purchased defendant's stock at an "artificially inflated purchase price" and thereby sustained damages. *Id.* at 347. The Court required something more, stating:

> We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving

any indication of the economic loss and proximate cause
that the plaintiff has in mind would bring about the harm of
the very sort that the [PSLRA] seek[s] to avoid.

*Id.* at 347 (citations omitted). A failure to recognize that loss causation be specifically alleged and demonstrated by the allegations of the complaint would

> permit a plaintiff with a largely groundless claim to simply
> take up the time of a number of other people, with the right
> to do so representing an *in terrorem* increment of the settle-
> ment value, rather than a reasonably founded hope that the
> discovery process will reveal relevant evidence. Such a rule
> would tend to transform a private securities action into a
> partial downside insurance policy.

*Id.* at 347-48 (internal quotation marks and citations omitted).

Accordingly, we conclude that a plaintiff purporting to allege a securities fraud claim must not only prove loss causation — that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages — but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

The complaint in this case outlines a theory of loss causation, identifying the plaintiffs' loss as the $4.11 drop in the price of Cree's stock that followed publicity of Eric Hunter's lawsuit against Cree in June 2003. According to plaintiffs, Hunter's complaint finally revealed the "true facts" of Cree's fraudulent schemes over the years, causing the market to reduce its valuation of Cree's shares. But this theory must fail for various reasons. First, Eric Hunter's 2003 complaint contained no allegations relating to the "round-trip" transactions with Microvision, Spectrian, WTI, Xemod, or Lighthouse, about which he now complains. Because Hunter's 2003 complaint did not reveal the "true facts" of these transactions, the 2003 revelations could not have *caused* the plaintiffs' loss. While plaintiffs respond that "the market would have construed Hunter's allegations [in his 2003 complaint] broadly since Cree had previously denied it engaged in round

tripping," the problem remains that Hunter's 2003 complaint is devoid even of general allegations of round-tripping. We thus agree with the district court's dismissal for lack of pleading loss causation with respect to Cree's dealings with Microvision, Spectrian, WTI, Xemod, and Lighthouse.

Second, with respect to Cree's dealings with C&C, plaintiffs' theory of loss causation suffers from a different but no less fatal flaw. Eric Hunter's 2003 complaint did contain allegations relating to C&C, accusing Cree and Neal Hunter of:

> (d) Entering into an undisclosed and long-term requirements contract with Jeff Hunter, Chairman of [C&C] Corporation . . . which required [C&C] to accept shipments of silicon carbide crystals . . . far in excess of market demand, in order to artificially increase the operating and income of Cree by approximately forty percent or more, and artificially increased the per share value of Cree stock.

> (e) Misleading investors and the [SEC] by purchasing in excess of $4.0 million worth of equipment from [C&C] in which Cree already held a beneficial interest, with the understanding that [C&C]'s Chairman would restrict use and allocation of the proceeds to payments under the long-term requirements contract, thereby disguising [C&C]'s severe cashflow deficit and forced inventory surplus of silicon carbide crystals.

The problem with plaintiffs' theory on the C&C transactions is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline. Cree's May 1999 quarterly filing with the SEC included a copy of its supply contract with C&C, which obligated C&C to purchase set amounts of silicon carbide crystals. Likewise, C&C's April 2000 quarterly report and Cree's 2000 annual report disclosed that Cree agreed to repurchase crystal-growing equipment for $5 million and apply that amount as a credit to C&C for future crystal purchases. Disclosure of these facts by Eric Hunter in his 2003 complaint could not therefore have caused Cree's stock price to decline. As the district court explained, "Eric Hunter's complaint discloses

nothing new, but merely attributes an improper purpose to the previously disclosed facts."

To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed Cree's previous representations to have been fraudulent.[3] Because no such facts were disclosed, the drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.

The plaintiffs argue in the alternative that they should at least be granted leave to amend their complaint in light of the Supreme Court's decision in *Dura Pharmaceuticals*, 544 U.S. 336 (2005). The Supreme Court decided *Dura Pharmaceuticals* in April 2005, after plaintiffs had filed their complaint and before the district court granted Cree's motion to dismiss. As noted above, however, we do not understand *Dura Pharmaceuticals* to have changed the standard for pleading loss causation. Even before Congress enacted PSLRA, plaintiffs were required to allege that the defendant's misrepresentation caused him actual loss. *See Harnett v. Billman*, 800 F.2d 1308, 1315-16 (4th Cir. 1986). And our discussion in *Miller v. Asensio & Co.*, 364 F.3d at 232-33, decided months before plaintiffs filed their complaint, aligns well with the Supreme Court's decision in *Dura Pharmaceuticals*, requiring a plaintiff to show a causal link between the defendant's misrepresentation and the decline in the stock value.

─────────────

[3]We acknowledge the possibility that a plaintiff could successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss. In such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of fraud that caused plaintiffs' loss. *See, e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-07 (S.D.N.Y. 2005) (accepting plaintiffs' allegations of loss causation where news that Parmalat could not service its debt revealed that previous disclosures concealed the company's true position and caused the share price to tumble). But the plaintiffs have not alleged that any previously concealed risk materialized in June 2003, causing their loss.

We can find no basis for concluding that *Dura Pharmaceuticals* provides plaintiffs with a cure for the deficient allegations of loss causation in their complaint. The information that Eric Hunter's complaint revealed to the world on June 12, 2003, were historical facts that plaintiffs could not change. The plaintiffs have, therefore, demonstrated no reason why we should permit them leave to amend their complaint.

For all of these reasons, we affirm the district court's order dismissing plaintiffs' claim under § 10(b) of the Exchange Act and Rule 10b-5 for failure to state a claim for which relief can be granted.

## VI

The district court dismissed plaintiffs' four other causes of action as essentially dependent upon plaintiffs' success in alleging a claim under § 10(b) of the Exchange Act and Rule 10b-5. Count II alleges a claim under § 20(a) of the Exchange Act, which imposes liability on each person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Count III is based on § 20A of the Exchange Act, which provides a private right of action against one who engaged in insider trading. *Id.* § 78t-1(a). Count IV brings a claim under § 18 of the Exchange Act which holds a person, who makes a misleading statement in an SEC filing, liable to one who detrimentally relied on that misstatement. *Id.* § 78r(a). Each of these counts requires a predicate allegation of a violation of law. Because, as we explained above, the complaint fails to allege that Cree made any misleading statement or omission in violation of § 10(b) and Rule 10b-5, we affirm the district court's dismissal of these claims.

Plaintiffs' final claim arises under § 304 of the Sarbanes-Oxley Act, which mandates that corporate officers forfeit bonuses and profits if the corporation is "required to prepare an accounting restatement" due to the issuer's "misconduct." 15 U.S.C. § 7243. While Cree has not, to date, issued any accounting restatement that could provide a basis for this claim, plaintiffs argue that § 304 is not dependent upon a restatement having actually been issued, but upon one being "required." They note that the complaint alleges numerous GAAP violations which "require" Cree to issue restatements.

Even if this were the case, for the reasons we rejected the complaint's § 10(b) and Rule 10b-5 claim, we conclude that the complaint does not adequately allege that any restatement is required.

In addition, plaintiffs have not presented a convincing analysis that § 304 provides private litigants with a cause of action, although we do not now reach that issue. *See Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 805 (4th Cir. 1996) (noting this court's "presumption that if a statute does not expressly create a private cause of action, one does not exist").

## VII

Because we uphold the district court's dismissal of plaintiffs' complaint in its entirety, we have no cause to pass upon Cree's argument that plaintiffs' claim is barred by the applicable statute of limitations.

## VIII

This case boils down to the continuing fallout from an intra-Hunter-family dispute. In June 2003, Eric Hunter, a former officer of Cree, sued his brother Neal Hunter, an officer of Cree, purportedly over dissatisfaction in the way Cree was being operated. With Eric Hunter's filing of that action, the price of Cree shares dropped over $4 per share. For this temporary drop in the price of Cree's stock, the plaintiffs in this case filed their complaint, attributing the drop to the way Cree was run during the four years prior to June 2003. While plaintiffs point to some reciprocal business dealings and high risk investments with six different companies during that period, the transactions were disclosed in public filings over the years, and the plaintiffs have not been able to point to facts supporting a reasonable belief that the disclosures were misleading.

The district court properly dismissed this case as one of the type that Congress sought to eliminate by enacting the PSLRA. The PSLRA's requirements that were applied in this case are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on actual fraud. The district court correctly concluded that this case fell into the former class of claims.

As an epilogue, it appears that the market reached the same conclusion regarding plaintiffs' allegations. The record shows that although Cree's share price dropped from $22.21 to $18.10 the day after Eric Hunter filed his complaint on June 12, 2003, and then dropped to a low of $11.84 in August 2003, the price recovered quickly, trading above $18.00 by the end of 2003, and at $22.00 or higher for most of 2004.

We affirm the judgment of the district court.

*AFFIRMED*

SHEDD, Circuit Judge, dissenting:

The district court dismissed the 170-page First Amended Consolidated Class Action Complaint ("Complaint") of Teachers' Retirement System of Louisiana ("TRSL"), which named as defendants Cree, Inc. and several of its managers (collectively, "Cree") in a complicated securities fraud action, holding that the Complaint failed to plead facts sufficient to support a cause of action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. In reaching its conclusion, the district court interpreted and applied the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737. In my view, the factual allegations in the Complaint satisfy the heightened pleading requirements of the PSLRA as well as the ordinary pleading requirements that apply to any action for fraud, as provided in Rules 8 and 9 of the Federal Rules of Civil Procedure. Accordingly, I would reverse the decision of the district court and remand this case for further proceedings consistent with this opinion.

I

We review *de novo* the decision of the district court to grant a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006). A court should grant a Rule 12(b)(6) motion only if "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in sup-

port of his claim entitling him to relief." *Edwards v. City of Golds-boro*, 178 F.3d 231, 244 (4th Cir. 1999).[1]

Generally speaking, the majority opinion correctly summarizes the law of securities fraud. To plead a *prima facie* case, one must allege: (1) a false statement or omission of material fact by the defendant, (2) scienter, (3) reasonable reliance by the plaintiff, and (4) loss causation. *Hillson Partners L.P. v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994). However, in contrast to an ordinary action for fraud, a securities fraud action must meet the heightened standards imposed by the PSLRA when pleading the first two of these four elements. 15 U.S.C. § 78u-4(a)(1). When pleading the final two elements of securities fraud, a plaintiff must simply satisfy the generally applicable requirements of Rules 8 and 9 of the Federal Rules of Civil Procedure.

As the majority notes, the district court dismissed the Complaint for three reasons: (1) failure to plead with particularity all facts giving rise to the belief that a false statement or omission of material fact occurred, (2) failure to plead with particularity facts giving rise to a strong inference of scienter, and (3) failure to adequately plead loss causation.[2] The majority approach to testing the adequacy of the Complaint examines in isolation each individual suspect transaction in order to ascertain whether the elements of securities fraud have been adequately pled with respect to each one.[3] However, this approach ignores the fact that this case revolves around a single securities fraud action against a single company, Cree.

---

[1] With the exception of requiring a strong inference of scienter, the PSLRA does not change our normal standard of review for a 12(b)(6) motion. For the most part, the PSLRA simply modifies the quantum of information that must be included in a complaint. Accordingly, for purposes of my analysis, I assume the truth of all well-pleaded allegations in the Complaint, and I draw all reasonable factual inferences in favor of TRSL.

[2] This is a fraud-on-the-market case; thus, investor reliance upon publicized market prices is presumed. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).

[3] This approach is substantially the same as the one employed by the district court, which, like the majority, divided its opinion into sections titled according to the companies that Cree dealt with: *i.e.*, C&C, Microvision, Spectrian, WTI, Xemod, and Lighthouse.

Therefore, the Complaint does not — and need not — allege an action for securities fraud with respect to all six companies with which Cree dealt. Instead, the Complaint alleges a single cause of action for securities fraud, as evidenced by many transactions with multiple companies. If even one of these transactions is pled adequately enough to meet the pleading requirements under the PSLRA and Rules 8 and 9, the cause of action must survive the motion to dismiss. Moreover, if the totality of Cree's actions reveals a larger picture of fraud sufficient to meet the necessary pleading requirements, this case must advance beyond the current stage of the proceedings. In my opinion, the C&C transactions alone, especially when viewed in conjunction with the numerous other transactions as a whole, permit a reasonable inference of fraud that requires denial of Cree's motion to dismiss.

## II

### A.

To plead a material misrepresentation or omission of material fact under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). TRSL has alleged a multitude of misleading statements by Cree. The Complaint plainly specifies each of these statements under the heading, "Defendants' False and Misleading Statements During the Class Period." J.A. 1007. The statements include 23 SEC filings, 22 press releases, two conference calls, and one news article. Therefore, the Complaint clearly meets the first prong of this element by specifying each statement believed to be misleading.

Further, the Complaint gives adequate reasons why each of the statements is misleading. TRSL has alleged that Cree was involved in numerous activities to inflate its revenue artificially. These fraudulent schemes, known as "channel stuffing" and "round-tripping," involved a series of sham deals in which Cree, in collusion with insiders at other companies, would exchange goods or services subject to either secret rights of return or secret agreements that excused Cree's

non-performance.[4] Cree included or referenced the favorable portions of these agreements in its SEC filings, press releases, conference calls, and the news article. However, the secret portions of the agreements, which rendered the agreements futile, were, of course, omitted. Thus, Cree's public representations about these agreements were misleading because they made material omissions — *i.e.*, the secret "handshake" deals that vitiated any substance the contracts otherwise appeared to retain.[5]

Finally, it is important to note that all of TRSL's allegations regarding Cree and its transactions are made on information and belief; thus, I agree with the majority that the Complaint must state at least "*sufficient facts* to support a *reasonable belief* in the allegation" that the material omissions were misleading. Maj. Op. 13. TRSL has alleged sufficient facts to support such a reasonable belief by basing many of its allegations on information obtained from a lawsuit filed by Eric Hunter, one of Cree's co-founders. The day before the class period closed, Eric Hunter filed suit against Cree, alleging, *inter alia*, securities fraud. In his complaint, Eric Hunter alleged that Cree had engaged "in a series of undisclosed corporate activities, including but not limited to" the following: (1) Cree's public filings omitted material facts in connection with stock offerings and (2) Cree entered into an undisclosed requirements contract with C&C that amounted

---

[4]An example is Cree's alleged channel stuffing agreement with C&C. C&C would "purchase" silicon carbide crystals from Cree, subject to a secret right of return. C&C would then exercise its secret right of return and "reject" shipments of crystals. However, instead of actually returning the crystals to Cree, C&C would store the crystals at its facilities, thereby allowing Cree to avoid accounting for reserves or charges for its returned products. Thus, this agreement allowed Cree to create the appearance of permanent sales and profits that were, in fact, illusory. Cree allegedly entered into similarly illusory "exchanges" with Microvision, Spectrian, and others.

[5]Both the district court and the majority seem to miss the crux of TRSL's argument on this point. Simply because a contract is publicly disclosed and appears to be legitimate does not prevent it from being materially misleading. The secret agreements between Cree and the other companies caused the publicly disclosed contracts to appear to be something that they were not. These omissions are what rendered the public statements materially misleading.

to channel stuffing and round-tripping.[6] J.A. 672. Eric Hunter is the brother of Neal Hunter, Cree's chairman during the class period. Eric Hunter is also the brother of Jeff Hunter, C&C's chairman during the class period. In addition to being a co-founder of Cree, Eric Hunter was Cree's CEO until 1994, and during the class period, he was a paid consultant for Cree.[7] Eric Hunter's statements and his close professional and familial relationship to the allegedly fraudulent actors certainly support a reasonable belief that the omissions in Cree's public statements were misleading.

Though Eric Hunter's allegations alone would likely suffice to satisfy the particularity requirements that the PSLRA imposes on allegations made under information and belief, TRSL identifies numerous other sources who attest to the fraudulent, secret agreements between Cree and other companies. The majority refers to these individuals as "confidential sources." Maj. Op. 14.[8] In addressing these confidential

---

[6]Though Eric Hunter's complaint never used the words "channel stuffing" or "round-tripping," it alleged facts sufficient to reasonably infer such schemes.

[7]The fact that Eric Hunter performed no work in his capacity as a consultant only underscores the continuation of his "insider" status with Cree, despite the fact that he was no longer an executive in the company. Only someone with close personal ties to a corporation would receive a salary in exchange for no substantial work.

[8]I question if the characterization as "confidential" is particularly useful in this context, where the sources are readily discernable by Cree. These sources are confidential only in that they are not specifically named; however, TRSL identified them by title and the years they were employed by various companies. Though their names do not appear in the Complaint, a modest inquiry by Cree would likely establish who they are. These so-called confidential sources cited by TRSL are numerous, and they certainly provide sufficient facts to form a reasonable belief that Cree's public statements were misleading.

For example, TRSL identifies a former Cree process engineer employed during the class period; this source learned from a top manager at Cree that a secret deal existed between Cree and C&C, which required C&C to accept shipments of crystals far in excess of its needs. TRSL also reveals a former C&C director and vice president of marketing, who claimed that C&C was simply "feeding Cree" and spending money like "drunken sailors" because of the close familial relationship between the directors of Cree and C&C. Many more examples of such unnamed sources are presented in the Complaint.

sources, the majority adopts the analysis of the Seventh Circuit in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006). The *Tellabs* court held that a complaint which relies on confidential sources must allege facts sufficient "'to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* at 596 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

I would resolve the issues surrounding unnamed sources differently because the approach adopted by the majority does not inhere in the plain language of the PSLRA. The plain language of the PSLRA does not subject unnamed sources to higher scrutiny than other averments made upon information and belief. Accordingly, in my view, a complaint must simply identify unnamed sources "with particularity," as required by the plain language of the PSLRA, which might include the source's job title and years of employment, or possibly, other facts sufficient to support a reasonable belief that the plaintiff did not merely invent sources. The purpose of the PSLRA's particularity requirement is to prevent the fabrication of information, not to weigh its reliability or credibility.[9] For example, a personal aide or administrative assistant to the CEO could plausibly overhear a pertinent piece of information that may later form the basis for a securities fraud action, notwithstanding his job title. Accordingly, I believe that both Eric Hunter and the numerous unnamed sources listed in the Complaint provide sufficient particularity to form a reasonable basis for believing that the disclosed contracts made materially misleading omissions.

## B.

To plead adequately the scienter element of a securities fraud action, a complaint must allege "with particularity facts giving rise to

---

[9]Like the district court, the majority weighs the credibility of various unnamed sources and discredits them because their recollections conflict with publicly available information. However, assessing a 12(b)(6) motion requires that we refrain from weighing evidence and assume all facts in favor of the plaintiff. This is particularly relevant in the current case, where the crux of TRSL's claim is that Cree falsified publicly available information.

a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2). We have noted that scienter may be pled by allegations that amount to severe recklessness. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). In *Ottman*, we rejected a categorical approach that would require a pleading to allege motive and opportunity in order to satisfy the heightened scienter pleading standards under the PSLRA. *Id.* at 345. Instead, we adopted a case-specific approach, which requires courts to "examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter." *Id.*

Based on a reading of the Complaint as a whole, I believe it adequately pleads scienter. Assuming the truth of the material misrepresentation allegations, the individuals named as defendants certainly would have known about the secret agreements between Cree and various other companies. Aside from the personal wealth that Cree management allegedly gained from the channel stuffing and round-tripping agreements,[10] the mere fact that individual executives and directors were the people actively entering into fraudulent agreements to inflate Cree's revenues supports a strong inference of scienter. The material omissions from Cree's public statements could not have occurred without the agents of the company knowingly facilitating the fraudulent transactions. Accordingly, a strong inference of scienter is supported under the facts alleged in the Complaint as a whole.

## C.

Finally, the Complaint must adequately allege loss causation, which is not subject to any heightened pleading requirement under the PSLRA. I agree with the majority that the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), expressly refused to decide whether loss causation must meet the ordinary pleading requirements of Rule 8 or the heightened pleading requirements for fraud under Rule 9. Instead, the Court "assume[d], at least for argument's sake," that the ordinary requirements of Rule 8

---

[10]I do not rely on the timing or substance of stock trades in finding a strong inference of scienter. Rather, scienter may be directly shown by the nature of the fraudulent acts at issue here — intentionally omitting salient details from otherwise publicly disclosed contracts.

applied. *Id.* at 346. Following the example of the Court in *Broudo*, I analyze the allegations of loss causation in the Complaint under the ordinary Rule 8 "short and plain statement" requirement.

The Complaint alleges loss causation by referencing the precipitous decline in stock value upon the filing of Eric Hunter's lawsuit against Cree. Though Eric Hunter's complaint specifically referenced only the secret agreements with C&C, it clearly stated that Cree had engaged in a "series of undisclosed . . . violation[s] of the federal securities . . . laws, including but not limited to" the agreements with C&C. J.A. 672. Eric Hunter's complaint contradicted, or at least called into question, Cree's prior denials of round-tripping. When the information in Eric Hunter's complaint became public knowledge, Cree's stock price dropped by nearly 20%. Under the normal pleading standards of Rule 8, a reasonable inference of loss causation plainly exists under these facts. I simply cannot envision a more direct and proximate causal link than an insider's disclosure of fraud that causes a sudden and severe drop in stock price.[11] These facts, which are assumed to be true for purposes of my review, plainly give rise to a reasonable inference of loss causation.

### III

Accordingly, I would reverse the district court and remand for further proceedings.[12]

---

[11]I note that this case is distinguishable from *Dura* because the corrective disclosure in *Dura* was much more tenuously connected to the allegations made in Broudo's complaint. The corrective disclosure in *Dura* — a company press release — simply stated that earnings would be diminished because of reduced drug sales. *Id.* at 339. However, the primary misrepresentations that Broudo allegedly relied upon related to the pending approval of an asthmatic spray device by the Federal Drug Administration. To the contrary, in the case before us, the corrective disclosure was a lawsuit filed by an insider that revealed secret fraudulent agreements; the misrepresentations that TRSL relied upon were public disclosures that failed to mention these secret agreements. Thus, compared to *Dura*, this case has a much closer nexus between the corrective disclosure and the misrepresentations relied upon by TRSL.

[12]Because the district court disposed of TRSL's other claims based on its dismissal of the securities fraud claim, I would remand for further proceedings on these claims as well.